UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>450 Fifth Street, N.W.<br>Washington, D.C. 20549,<br><br>      Plaintiff,<br><br>      v.<br><br>U.S. TECHNOLOGIES, INC., and<br>C. GREGORY EARLS,<br><br>      Defendants. | COMPLAINT |

The Securities and Exchange Commission alleges that:

**SUMMARY**

1. From June 1998 through August of 2002, defendant C. Gregory Earls, the chairman and chief executive of defendant U.S. Technologies, Inc. ("UST"), misappropriated approximately $13.8 million from investors who believed they were giving Earls money to purchase preferred stock and warrants from the company.

2. Earls carried out this scam through a limited liability company he created called USV Partners LLC. Earls falsely told investors in USV Partners that the entity was created solely to purchase and hold UST stock and warrants, and that he would not take any management fees. Since 1998, Earls lured more than one hundred investors into giving him more than $20 million to purchase UST securities through USV Partners. Although UST badly needed this

capital infusion, Earls bought only a small portion of the stock he promised investors. He then misappropriated $13.8 million of their money by paying himself $4.7 million in management fees and $9.1 million that he falsely classified as "Legal and Accounting" expenses. Neither UST nor Earls has ever publicly disclosed Earls' diversion of these investor funds.

3.      In addition, Earls and UST made numerous materially misleading statements and omissions to cover up Earls' misdeeds. For example, while touting Earls' supposed business experience and acumen, the defendants failed to disclose that he had previously been accused of misappropriating investor funds in connection with several other companies. Earls and UST also failed to properly reveal the material weaknesses noted by its independent auditor concerning its internal accounting controls. And, most recently, the defendants failed to disclose that half of its board of directors resigned in or about April 2002.

4.      The defendants' conduct constitutes securities fraud and violates the reporting, books-and-records, and internal-controls provisions of the federal securities laws. Earls and UST should be permanently enjoined from further securities-law violations, and Earls should be ordered to disgorge, with interest, all misappropriated investor funds and other ill-gotten gains; required to pay a substantial civil penalty; and barred from acting as an officer or director of any public company.

## JURISDICTION

5.      This Court has jurisdiction pursuant to Sections 20 and 22(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77t and 77u(a), and Sections 21(d) and 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78u(d)(3) and 78aa.

**DEFENDANTS**

6.    Defendant UST is a Delaware corporation headquartered in Washington, D.C. During much of the period relevant to this action UST's common stock was quoted on the over-the-counter bulletin board. Until Earls' involvement with the company, UST ran a contract labor business using prison inmates to manufacture furniture and other products. Earls shifted the focus of the company toward funding fledgling Internet companies.

7.    Defendant Earls, a resident of Washington, D.C., is the chairman and sole remaining member of UST's board of directors and its chief executive officer.

**THE FRAUD**

The USV Partners Scam

8.    Earls joined UST's board of directors in April 1998. Two months later, he formed USV Partners, a Delaware limited liability company, and registered it at his home address. Earls had a bookkeeper maintain USV Partners' books and records at UST's offices in Washington, D.C. USV Partners had no employees or principals besides Earls. Earls paid the bookkeeper using funds from UST and US Viewing LLC, an Earls alter ego.

9.    In soliciting investors for USV Partners, Earls represented that all investments in USV Partners would be used to purchase UST stock and warrants. Earls further represented that he would take no fees as the sole manager and director of the entity controlling USV Partners. In truth, however, Earls used only a portion of the investors' money to purchase UST securities. He transferred the rest of the money – approximately $13.8 million – into his own accounts. He fraudulently accounted for the transfers on USV Partners' books as management fees totaling $4.7 million and fictional "Legal and Accounting" fees totaling $9.1 million.

10. During the relevant period, Earls instructed his bookkeeper on a daily or weekly basis to wire transfer USV Partners investor money to his personal accounts. First, Earls would have the money transferred into an account for U.S. Viewing. In 2001 alone, such transfers totaled more than $3.2 million. Earls instructed his bookkeeper to account for these transfers on USV Partners' books as "Legal and Accounting" fees. In fact, USV Partners' books already had separate accounts established for legal and accounting fees, which amounted to only tens of thousands of dollars.

11. After transferring the investor funds to U.S. Viewing, Earls treated them as his own personal funds, which he disbursed to, among others, himself, his ex-wife, and an investor who had sued him.

12. Despite his promise to forgo management fees, Earls paid himself management fees using USV Partners funds. In 2001 alone, Earls paid himself management fees totaling $2.5 million.

13. One key to Earls' success was that he prominently associated himself with charitable organizations, in order to ingratiate himself with wealthy, powerful, and well-known people. He attended charitable galas to meet wealthy people and gain their confidence. He often made substantial pledges at the charity events he attended (and sometimes chaired), but frequently failed to honor them when payment came due. By networking at these charitable events, Earls was able to induce a few wealthy and well-known individuals to invest with him, and then used those investors to attract even more investors. In some cases Earls attracted investors by offering them a choice position with one of his entities, such as a seat on a board of directors or, in one case, the position of Commissioner of a minor league baseball league. In one

case, Earls simply lied and told a victim that a certain prominent individual was an investor when in fact he had never invested with Earls.

14. Once he gained the trust of his victims through these social or charitable connections, Earls made relentless appeals for their money. While he focused on the rich and powerful, Earls was indiscriminate about whose money he would take. His victims covered the socio-economic spectrum. They included Washington socialites, a well-known merger and acquisition expert, a syndicated columnist, a speechwriter, a lobbyist, a former senator, and the parents of UST's receptionist.

15. After successfully defrauding the initial USV Partners investors, Earls used his effective control over UST both to attract more victims and to prolong his scheme by using the company's stock as his personal currency. Over a three-year period, Earls used several classes of UST convertible preferred stock both to lure new investors and to obtain additional funds from existing investors.

16. Ultimately, Earls misappropriated approximately $13.8 million from investors that was intended for investment in UST, which at the time was in dire need of capital. By the time his scheme unraveled, Earls had told USV Partners investors that they owned almost 30 million more UST shares than Earls had actually acquired.

Earls' Misappropriation of an Additional $1.3 Million from UST

17. In mid-2000, Earls agreed to raise funds for a privately held on-line grocery business called Fresh Direct, Inc. Fresh Direct was founded and primarily funded by its chief executive officer, who was also a major investor in USV Partners (hereinafter the "Fresh Direct CEO"). Earls agreed to help Fresh Direct obtain funding by finding investors. In reality, Earls

5

never found any investors by himself.  Instead, Earls took in funds from investors that the Fresh Direct CEO had previously found and then misappropriated their money.

19. One of these Fresh Direct investors was a bank.  The Fresh Direct CEO referred the bank to Earls, and Earls had the bank wire him $1.5 million.  The bank later instructed Earls to release the $1.5 million and to transmit the funds to Fresh Direct.  Earls did not wire the money.  When the Fresh Direct CEO confronted Earls, he apologized and falsely claimed there had been a bank error.  After four more days passed without the funds being transferred, Fresh Direct discovered that Earls still had not requested the necessary wire transfer.

19. Shortly thereafter, Earls wired $1.5 million to Fresh Direct to cover the bank's investment.  The funds Earls wired that day, however, were not those initially provided by the bank.  Instead, the $1.5 million consisted of $1.3 million he had received from a longtime investor (hereinafter the "Investor") and $200,000 obtained by Earls from other sources.

20. Earls then conceived a scheme that allowed him not only to conceal his misappropriation of $1.5 million belonging to the bank, but also to take an additional $1.3 million from UST.  Earls falsely told UST's bookkeeper that the Investor had changed his mind and had agreed to consider the $1.3 million he had given to Earls as a loan to UST for its operating expenses – a loan that UST would be obligated to repay to the Investor.

21. Shortly after he unilaterally converted the Investor's funds into a "loan" to UST, Earls told his bookkeeper that because the Investor was his close friend, he did not feel comfortable with the company owing the friend so much money.  Earls then told the bookkeeper that he would personally assume the company's $1.3 million "obligation" to the Investor, and that the company would then owe him $1.3 million.  Earls subsequently took $1.3 million from

UST in purported repayment of this fictional loan. In fact, the company never owed him this money. He never paid back the Investor.

Earls' Misrepresentations About UST's Interest in Gomembers.com

22. To divert attention from his massive fraud and the company's faltering business prospects, Earls repeatedly lied in early 2002 to inflate the value of UST's ownership interest in Gomembers.com, a fledgling Internet website. Earls told several investors, including at least one who sued him, that UST's interest in Gomembers.com was worth $30 to 40 million. He told UST's board of directors that the company owned a warrant representing 20 to 25 percent of Gomembers.com's total equity, which by Earls' math translated into a UST asset worth approximately $28 million. In fact, as a UST board member learned in early July 2002, no such warrant ever existed. In reality, one of UST's small Internet incubator companies owned less than one-half of one percent of Gomembers.com -- an interest worth no more than $1.3 million, even at the peak of valuations for dot-com companies.

UST's Misleading and Delinquent Public Filings

A. The Company Failed to Disclose Earls' Questionable Business Past

23. From the time Earls joined UST's board in April 1998, the company touted his business acumen and experience. In the biographical information contained in the company's press release announcing his appointment to the board, and in subsequent Form 10-Ks and proxy statements, the company consistently cited Earls' association with many business entities, including U.S. Viewing Corporation, Equitable Production Funding of Canada, Inc., and National Networks, Inc. Earls and UST did not disclose that these Earls-related entities had been sued along with Earls by investors alleging racketeering or Ponzi schemes going to the heart of

Earls' trustworthiness with investor funds, and that Earls had quietly paid the plaintiffs to settle some of these cases.

24.  For example, in touting Earls' status as President and CEO of U.S. Viewing Corporation, UST described that company as "a private investment management company."  In fact, U.S. Viewing is one of the vehicles Earls has used for several years to misappropriate funds from investors in his various partnerships.  Indeed, at least one unhappy investor in an earlier failed Earls scheme had sued U.S. Viewing by the time Earls was trumpeting his involvement with the entity in UST's public filings.  Similarly, UST and Earls highlighted his role as President and director of National Networks, Inc., which UST's filings describe as "a private investment company."  They failed to disclose, however, that Earls and National Networks were sued for fraud in 2000 for misappropriating an investor's money that was supposed to be invested in Data Broadcasting Corporation shares.

25.  Moreover, the only public company cited in Earls' biographical information – Jayhawk Acceptance Corporation, as to which Earls is touted as a co-founder and a director since 1994 – went bankrupt in February 1997, slightly more than a year before Earls joined the board of UST.  UST's public filings omitted this material fact.

26.  UST and Earls also omitted any reference to several other entities that investors alleged Earls had used to perpetrate fraudulent investment schemes similar to the one involving USV Partners.  For example, UST's public filings did not disclose Earls' association with AVAC Holdings LLC, which he had allegedly used to misappropriate investor funds intended to purchase Greyhound Lines securities.

    B.    <u>UST Failed to Disclose Earls' Misappropriations From UST Investors</u>

27.    During the relevant period, UST relied on periodic capital infusions from investors both to make new investments and to fund its operations. Starting no later than 2000, UST in its Form 10-Ks and 10-Qs told investors that "current economic and business conditions have created a difficult environment in which to raise capital." While true in part, UST's filings failed to tell investors that USV Partners had received approximately $20 million specifically designated for investment in UST, but that its CEO had diverted $13.8 million of these funds for his own personal use.

28.    In addition, in its 2001 Form 10-K, UST falsely described Earls' misappropriation of the Investor's $1.3 million related to Fresh Direct. In its description of related party transactions, UST asserted that Earls and his affiliates lent the company more than $1.5 million. In fact, $1.3 million of the $1.5 million was actually the Investor's funds. As described above, neither Earls nor the Investor actually lent UST $1.3 million. Instead, Earls took the Investor's money to cover his own misappropriation of the bank's $1.5 million investment, and unilaterally characterized the Investor's funds as a "loan" to UST. Then Earls "assumed" UST's fictional obligation to repay the Investor, which resulted in a UST "debt" to Earls for $1.3 million. In reality, UST did not owe Earls anything, but Earls took the $1.3 million from UST's dwindling reserves anyway, without ever repaying the Investor.

    C.    <u>UST Failed to Disclose Its Outside Auditor's Warnings About Internal Accounting Controls</u>

29.    From late 2000 through August 2001, UST's independent auditors repeatedly warned UST that it lacked the internal accounting controls required of public companies. On

July 13, 2001, the auditors informed UST in writing that it had several problems that rose to the level of material weaknesses in its internal controls, including: (1) lack of organization in its accounting department; (2) lack of a full-time competent CFO; (3) poor document retention and storage, and (4) failure to record significant transactions on a timely basis.

30. On August 16, 2001, UST told the auditors that it was changing audit firms, and on August 22, 2001, UST filed a Form 8-K with the SEC to disclose this change. Despite having been warned by its auditors to do so, UST failed to disclose the auditor's determination that UST's internal controls were inadequate, in violation of the requirements of Item 304(a)(1)(v)(A) of Regulation S-K. On September 6, 2001, UST was forced to amend its Form 8-K, after receiving a copy of a letter the auditors sent to the SEC, which noted the auditors' previously expressed concerns regarding the material weaknesses in UST's internal controls.

D. <u>UST's Late Public Filings</u>

31. During the first eight months of 2001, UST effectively abdicated its responsibility to file periodic reports with the Commission, which caused the company's stock to be removed from the over-the-counter bulletin board. The company's Form 10-K for its fiscal year 2000 was due on April 2, 2001, but was not filed until four months later, on August 7, 2001. This delay was caused in part by UST's delinquency in paying the auditors for previous services and by problems with UST's internal controls. As a result, UST's auditors did not even commence their fieldwork for the audit until mid-March 2001. Another reason for the delay was that for several months throughout the spring and summer of 2001, UST tried unsuccessfully to convince the auditors that their audit report should not contain a "going concern" qualification. During the same period, UST failed to file its Form 10-Q for the first quarter of UST's fiscal year 2001,

which was due on May 15th; the company ultimately made that filing on August 7, the same day it filed its untimely Form 10-K.

32.     Thus, the company provided no current financial information to investors during the eight-month period from November 14, 2000 (when it filed its Form 10-Q for the quarter ended September 30, 2000) to August 7, 2001, thereby delaying for many months any public disclosure of its auditor's "going concern" qualification.  Making matters worse, the company on August 7 restated its financial results for the first three quarters of its fiscal year 2000, which had until that point been the only available financial information about the company since its fiscal year 1999.  The restatement informed UST's shareholders that the company's accumulated deficit as of September 30, 2000, was more than $35 million, rather than $21 million as originally reported.  The restatement also revealed that the company's loss per share during the first three fiscal quarters of 2000 was 61 cents, rather than 10 cents as originally reported.

33.     More recently, the company has not filed any periodic reports with the Commission since May 2002, which has resulted in its stock again being removed from the bulletin board.

E.     <u>Deficient and Misleading Disclosures About the Resignations of UST Directors</u>

34.     In early 2000, UST added several prominent Washington political figures to its board of directors to bolster the apparent credibility and stature of the company.  This enhanced credibility and stature was critical in Earls' efforts to find new investors for USV Partners and to raise needed capital to allow UST to continue operating.

35.     By early May 2002, however, after being notified of several investor lawsuits filed against Earls -- including one involving USV Partners -- four of the board's seven independent

members resigned.  UST has never disclosed these resignations in its public filings, which would have been material to investors.

36.     The three remaining independent board members resigned in July 2002, shortly after receiving notice from Earls that UST would not be renewing its directors and officers insurance policy.  This left Earls as the sole remaining director.  The company filed a Form 8-K disclosing these three resignations but provided no reasons for them.  The Form 8-K made no mention of the previous resignations of the four independent directors several months earlier.

## FIRST CLAIM

### [Securities Fraud—Exchange Act Section 10(b) and Rule 10b-5]

37.     Paragraphs 1 through 36 are realleged and incorporated by reference.

38.     As described above, in connection with the purchase and sale of UST and USV Partners securities, defendants UST and Earls, directly or indirectly, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange: (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.  Earls also knowingly provided substantial assistance to UST in committing such violations.

39.     By engaging in such conduct, UST and Earls violated Exchange Act Section 10(b) and Rule 10b-5, and Earls aided and abetted UST's violations.

## SECOND CLAIM

### [Securities Fraud—Securities Act Section 17(a)]

40. Paragraphs 1 through 39 are realleged and incorporated by reference.

41. As described above, in the offer and sale of UST and USV Partners securities, UST and Earls, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of UST and USV Partners securities.

42. By engaging in such conduct, UST and Earls violated Securities Act Section 17(a).

## THIRD CLAIM

### [Reporting Violations]

43. Paragraphs 1 through 42 are realleged and incorporated by reference.

44. As described above, UST filed untimely and materially misleading periodic reports with the SEC on Forms 10-K, 10-Q, and 8-K, and Earls knowingly provided substantial assistance to UST in doing so.

45. By engaging in such conduct, UST violated Exchange Act Section 13(a) and Exchange Act Rules 12b-20, 13a-1, 13a-11, and 13a-13, and Earls aided and abetted those violations.

## FOURTH CLAIM

### [Books-and-Records and Internal-Controls Violations]

46.     Paragraphs 1 through 45 are realleged and incorporated by reference.

47.     As described above, UST failed to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of assets, and failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization; and (ii) transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles, and to maintain accountability for its assets.  Earls knowingly provided substantial assistance to UST in these failures by, among other things, knowingly failing to implement a system of internal accounting controls, knowingly circumventing the internal accounting controls that did exist at UST, and knowingly falsifying UST's books, records, and accounts.

48.     By engaging in such conduct, UST violated Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B), and Earls aided and abetted those violations and directly violated Exchange Act Section 13(b)(5) and Exchange Act Rule 13b2-1.

### PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that this Court enter a Final Judgment:

A.     Permanently enjoining defendant UST from violating Securities Act Section 17(a), Exchange Act Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B), and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13-11, and 13a-13;

B.     Permanently enjoining defendant Earls from violating Securities Act Section 17(a),

    Exchange Act Sections 10(b) and 13(b)(5), and Exchange Act Rules 10b-5 and13b2-1, and from aiding and abetting violations of Exchange Act Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B), and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13-11, and 13a-13;

C.    Ordering Earls to disgorge, with interest, all misappropriated investor funds and other ill-gotten gains in connection with the unlawful conduct described above;

D.    Ordering Earls to pay an appropriate civil penalty pursuant to Securities Act Section 20(d) and Exchange Act Section 21(d)(3);

E.    Prohibiting Earls from acting as an officer or director of any issuer that has a class of securities registered pursuant to Exchange Act Section 12 or that is required to file reports pursuant to Exchange Act Section 15(d); and

F.    Granting such further relief as the Court deems just and proper.

Dated: December 19, 2002						Respectfully submitted,

_____
David L. Kornblau
Paul R. Berger (DC Bar No. 375526)
Russell G. Ryan (DC Bar No. 414472)
C. Hunter Wiggins (DC Bar No. 447010)
Kevin M. Haley (DC Bar No. 460611)

Attorneys for Plaintiff
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, D.C.  20549-0911
(202) 942-4818 (Kornblau)
(202) 942-9581 (fax)
kornblaud@sec.gov